IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| JASON NEWBERRY, | Cause No. CV 19-50-H-DLC |
| Plaintiff, | |
| vs. | ORDER |
| CINDY McGILLIS-HINER; CONNIE WINNER; DR. REES; DR. HURST; WARDEN LYNN GUYER; REGINALD MICHAEL; and MELISSA SCHARF, | |
| Defendants. | |

Plaintiff Newberry filed this action on August 5, 2019. He alleges that Defendants violated the Eighth Amendment by failing to provide adequate relief for his back and elbow pain and violated the Americans with Disabilities Act by failing to provide reasonable accommodations.

Defendants waived service of process and answered on July 13, 2020. United States Magistrate Judge John Johnston set a schedule for the case, including a discovery deadline of December 18, 2020, and a motions deadline of January 15, 2021. He later extended the motions deadline to February 22, 2021.

On January 7, 2021, Judge Johnston entered an Order and Findings and Recommendations (Doc. 92) concerning numerous motions. His rulings remain

1

pending for this Court's review.  Since Judge Johnston issued his Order, Newberry has filed 49 more motions and numerous other documents as well.  Defendants move for summary judgment.

The need to conserve judicial resources is good cause to withdraw reference of this matter to Judge Johnston.  *See* 28 U.S.C. § 636(c)(4); D. Mont. L.R. 72.2(c) (Dec. 1, 2019).

## I.  Findings and Recommendation

Newberry is entitled to *de novo* review of those findings to which he specifically objects.  *See* 28 U.S.C. § 636(b)(1)(C).  The Court reviews for clear error those findings to which no party objects. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003); *Thomas v. Arn*, 474 U.S. 140, 149 (1985). Clear error exists if the Court is left with a "definite and firm conviction that a mistake has been committed."  *United States v. Syrax*, 235 F.3d 422, 427 (9th Cir. 2000) (internal citations omitted).

### A.  Motion to Amend Complaint

Judge Johnston permitted Newberry to add one defendant and a claim under the Americans with Disabilities Act.  He recommended denying Newberry's motion to add new claims and defendants that are not related to the allegations of the amended complaint filed on December 19, 2019 (Doc. 6).  *See* Order (Doc. 92 at 6–13, 31 ¶¶ 4–5, 34 ¶¶ 1–2); *see also* Order (Doc. 5 at 12–13 & n.2.)

2

Newberry objects that he should be permitted to proceed on a claim under the Prison Rape Elimination Act or for "sexual abuse." *See* Mot. (Doc. 99) at 2; Mot. (Doc. 101 at 1–2); *see also* Order (Doc. 8 at 2) (dismissing PREA claim). His allegation that a medical provider "winked" at him "in a sexual way," Am. Compl. (Doc. 6 at 11), does not state a claim on which relief may be granted under the Eighth Amendment, PREA, or any other law. *See, e.g.*, *Austin v. Terhune*, 367 F.3d 1167, 1171–72 (9th Cir. 2004); *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996).

In motions that could be construed as timely responses to the Findings and Recommendation, Newberry discusses some of his new, unrelated claims. *See, e.g.*, Mot. (Doc. 99 at 3) (building codes); Mot. (Doc. 100 at 2) (COVID-19). But he fails to explain why he believes Judge Johnston erred or why unrelated claims and defendants should be added to his pleading.

Even on a *de novo* standard of review, the Court sees no error in Judge Johnston's findings or in his recommendation to confine this action to the boundaries of the amended complaint filed on December 19, 2019.

### B.  Motions for Injunctive Relief

Judge Johnston also recommended denying Newberry's requests for injunctive relief.  Newberry no longer resides at Montana State Prison, but he remains a prisoner, and some of the Defendants hold office with the Department of

Corrections.  Injunctive relief is not mooted by Newberry's transfer.

Newberry moved for an order allowing him to keep Benadryl on his person (Doc. 42).  He also asked the Court to survey other inmates about their medical needs (Doc. 42) and monitor the prison's response to COVID-19 (Docs. 37, 40, 55.)  Judge Johnston recommended denying these requests because they are outside the scope of the pleadings.  *See* Order (Doc. 92 at 16, 18); *Pac. Radiation Oncology, LLC v. The Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015). Having denied Newberry leave to amend his pleading to add such claims, the Court finds Judge Johnston's recommendation is correct.

Excepting one provider Newberry approved (Docs. 27, 35), he sought an order prohibiting all other Montana State Prison medical providers from treating him, due to alleged "threats" and "sexual advances" (apparently meaning the wink) by doctors and staff.  *See* Order (Doc. 92 at 14–16.)  Judge Johnston recommended denying this motion for lack of evidence supporting threats or advances.  *See* Order (Doc. 92 at 14–16.)  Newberry objects by repeating his allegations.  *See* Mot. (Doc. 109-1 at 1–2.)  Repetition is not evidence, and threats are not at issue in this case. Judge Johnston's recommendation is correct.

Newberry sought an order requiring immediate administration of a spinal epidural injection containing medications specified by him (Docs. 25, 42) and an order requiring his transport to an outside "spinal institution" to determine and

4

administer the "correct treatment" for his back (Doc. 53).  Judge Johnston

recommended denying these motions for lack of evidence supporting Newberry's

claims that Defendants are deliberately indifferent to his serious medical need for

pain relief.  *See* Order (Doc. 92 at 13–14); *see also* 18 U.S.C. § 3626(a)(2),

(a)(1)(B)(ii) (requiring injunctive relief to "be the least intrusive means to correct"

a "violation of a federal right").  The Court sees no error in the recommendation,

but the issue is mooted by the ruling below, *see* Part III(C), on Defendants' motion

for summary judgment.

### C.  Plaintiff's Motion for Summary Judgment

Judge Johnston recommended denying Newberry's motion for summary

judgment (Doc. 56) because he did not timely file a statement of undisputed facts.

*See* Order (Doc. 92 at 28.)  The motion was properly denied.

### D.  Conclusion

Having construed all of Newberry's timely submissions (Docs. 99, 100, 101,

102, 109, 109-1) as objections, the Court finds no error and adopts Judge

Johnston's Findings and Recommendations in full.

## II.  Plaintiff's Motion for Counsel

On January 25, 2021, Newberry moved the Court to appoint counsel to

represent him.  *See* Mot. (Docs. 107, 108.)[1]  Newberry did not seek and was not

---

[1]  The caption of Newberry's supporting brief (Doc. 108) refers to his "second" motion

granted leave to proceed in forma pauperis.  *See, e.g.*, Order (Doc. 3); Notice (Doc. 4); Docket Entry Oct. 25, 2019.  However, there is some ambiguity in the record, *see* Order (Doc. 7 at 1); Am. Order (Doc. 9) at 1 (both citing 28 U.S.C. § 1915(e)(2)); Mot. for Counsel (Doc. 107 at 1) (citing 28 U.S.C. § 1915(e)(1)).  The Court will consider the motion.  Notably, however, Newberry has not shown that he is financially unable to retain counsel.

A civil litigant is not entitled to the services of counsel at public expense, *see, e.g.*, *Palmer v. Valdez*, 560 F.3d 965, 970 (9th Cir. 2009), but the court may ask counsel to take a case under exceptional circumstances, *see* 28 U.S.C. § 1915(e)(1); *Agyeman v. Corrs. Corp. of America*, 390 F.3d 1101, 1103 (9th Cir. 2004); *Terrell v. Brewer*, 935 F.2d 1015, 1017 (9th Cir. 1991).

> A finding of exceptional circumstances requires an evaluation of both the likelihood of success on the merits and the ability of the petitioner to articulate his claims *pro se* in light of the complexity of the legal issues involved.  Neither of these factors is dispositive and both must be viewed together.

*Palmer*, 560 F.3d at 970 (quoting *Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983), and citing *Wilborn v. Escalderon*, 789 F.2d 1328, 1331 (9th Cir. 1986)).

Newberry's case is not so complex as to show a need for the assistance of counsel.  Newberry is not concise, but he is reasonably articulate.  He stated claims sufficient to warrant service of the amended complaint on the Defendants.  He also

---

for counsel.  The motion (Doc. 107) appears to be his first.

received a packet containing the applicable federal and local rules with his service copy of the Scheduling Order.  *See* Rules Packet (Doc. 13-2.)  He did not develop the factual basis of his case by following those rules.  He pursued his own path. But he also has not shown that a factual basis is likely to exist in view of the nature of his claims and the high standard of proof under the Eighth Amendment.  And Newberry did not request counsel until a month after discovery closed.

Appointing counsel under these circumstances would unfairly prejudice the Defendants, who adhered to the schedule, without appropriate justification in light of the evidence presented.  Newberry's motion for counsel (Doc. 107) is denied.

### III.  Defendants' Motion for Summary Judgment

Defendants move for summary judgment as to all claims and defendants. They assert that Newberry properly exhausted his administrative remedies only as to two or three narrow claims, so the other claims should be dismissed.  They also contend that Dr. Rees and Dr. Hurst appropriately treated Newberry's back and elbow pain; that Newberry fails to show Defendants McGillis-Hiner, Winner, Scharf (excepting one respect), Michael, or Guyer personally participated in the alleged violations of Newberry's rights; and that Newberry's ADA claims should be dismissed.

#### A.  Summary Judgment Standards

The Court will grant summary judgment if the moving party shows "there is

no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable juror to return a verdict in the non-moving party's favor.  *Id.*

Once the moving party submits evidence demonstrating the absence of a genuine dispute of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), the burden shifts to the non-moving party to show the existence of a genuine conflict in the evidence or in its interpretation, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Just as the moving party must produce evidence, the non-moving party also must "go beyond the pleadings" and point to evidence—that is, "depositions, answers to interrogatories, . . . admissions on file," and the like—to "designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e), now 56(c)(1)).

### B.  Failure to Exhaust Administrative Remedies

Before bringing a claim for relief to court, a prisoner must exhaust administrative remedies made available to him at the prison.  *See* 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Booth v. Churner*, 532 U.S. 731, 739 (2001).  "Exhaustion requirements apply based on when a plaintiff files

the operative complaint." *Jackson v. Fong*, 870 F.3d 928, 935 (9th Cir. 2017). Generally, the prisoner must follow the prison's grievance procedure, *see Woodford v. Ngo*, 548 U.S. 81, 88 (2006), but "the primary purpose of a grievance is to alert prison officials to a problem," *Jones v. Bock*, 549 U.S. 199, 219 (2007) (quoting *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004)).  Therefore, if the prison addresses a grievance despite a prisoner's failure to follow the rules, the exhaustion requirement may be satisfied.  *See, e.g.*, *Reyes v. Smith*, 810 F.3d 654, 657–58 (9th Cir. 2016).

The prisoner must show that he appealed any denial of relief to the highest level available; that he either complied with the procedural rules or that prison officials "render[ed] a decision on the merits of the grievance" despite the prisoner's failure to comply with the rules; and that the grievance "provide[d] administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of the suit."  *Johnson*, 385 F.3d at 522.

"[A] defendant must first prove that there was an available administrative remedy and that the prisoner did not exhaust that remedy."  *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015).  Defendants point out that Newberry's grievances generally failed to identify the persons involved in the matters he complained of.  *See, e.g.*, Grievance No. 11941 (Doc. 142-18 at 21); Defs. Br. (Doc. 141 at 12.)  The Ninth Circuit addressed this situation in *Reyes*.  There,

9

contrary to a California rule requiring that an inmate's grievances must "name all staff members involved in his case," the inmate failed to name the prison physicians who denied him narcotic pain medication.  *Reyes*, 810 F.3d at 657. Following seven other federal appellate courts, the Ninth Circuit held that "a prisoner exhausts such administrative remedies as are available . . . despite failing to comply with a procedural rule if prison officials ignore the procedural problem and render a decision on the merits of the grievance at each available step of the administrative process."  *Id.* at 658 (internal quotation marks and citation omitted); *see also, e.g.*, *Maddox v. Love*, 655 F.3d 709, 721–22 (7th Cir. 2011); *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324–26 (6th Cir. 2010), *discussed and followed in Reyes*, 810 F.3d at 658.  In other words, if prison officials find the grievance acceptable and address it despite its flaws, a court will not find the plaintiff failed to exhaust.

Montana, like California, requires prisoners to "[n]ame the person(s) you are grieving."  *See, e.g.*, Defs. Ex. I (Doc. 142-18 at 1–2) (Instructions).  As in *Reyes*, Defendants here have not shown that they rejected Newberry's grievances for failure to name names.  *See, e.g.*, *id*. at 1–3; Defs. SUF (Doc. 142 at 29–30 ¶ 98, 30–33 ¶¶ 100–107.)  Consequently, Newberry's failure to comply with the rule does not entitle Defendants to summary judgment.

Defendants mistakenly argue that Newberry had to complete exhaustion

before August 5, 2019, rather than before December 19, 2019—the date of the

operative pleading, that is, the amended complaint.  Nonetheless, their exhibits

demonstrate that Newberry appealed to the highest level his complaints regarding

inadequate management of his back pain.  He requested additional spinal epidural

injections, a cushion for sitting, and lower bunk and lower tier restrictions, *see*

Grievance Nos. 11488, 11565 (Doc. 142-18 at 1–9), as well as gabapentin,

Vicodin, Kenalog, or a "narcotic nerve blocker," Grievance Nos. 11940, 11941,

11997, 12165 (Doc. 142-18 at 17–31, 38–43.)

Newberry also pursued grievances seeking treatment, X-rays, and

consultation with an outside specialist to address his elbow injury.  He did not

appeal the decisions concerning treatment and X-rays, but he received the

treatment and X-rays (and explanation of them) that he requested.  No appeal was

necessary.

Newberry was denied consultation with an outside specialist regarding his

elbow and apparently did not appeal that decision.  *See* Grievance No. 11556,

11872, 11998 (Doc. 142-18 at 10–16, 33–34, 72–73.)  In addition, he apparently

did not request surgery for either his back or his elbow.  But, at least where a

medical issue is concerned, Defendants cannot obtain dismissal of the case by

showing that Newberry failed to appeal denial of a specific medical solution.  If,

for example, hospitalization for tests is the only appropriate medical response to a

11

prisoner's complaint, he cannot be barred from suing because he grieved lack of treatment but did not request tests or hospitalization.  The exhaustion requirement does not require inmates to be doctors.  Its purpose is "to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation."  *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009).

The question is whether Newberry's grievances fairly "alert[ed] the prison to the nature of his problem."  *Id*. at 1121.  Newberry certainly alerted the prison that he did not believe he was receiving adequate medical care for his back pain or his elbow.  Further, he did so before he filed his amended complaint in December 2019.

Defendants are not entitled to dismissal of Newberry's claims based on his alleged failure to exhaust administrative remedies.  This portion of the motion for summary judgment is denied.

## C.  Eighth Amendment Violations

### 1.  Applicable Standards

An Eighth Amendment claim alleging inadequate medical care has two elements.  First, a plaintiff must show that he had a "serious medical need," and second, he must show that the defendant responded to it with "deliberate indifference."  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014).

12

A serious medical need exists if failure to treat the plaintiff's condition could cause further significant injury or "the unnecessary and wanton infliction" of pain. *See Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle*).  To be deliberately indifferent to such a need, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The plaintiff must also show that the defendant's deliberately indifferent acts or omissions caused additional or continuing harm.  *See, e.g.*, *Jett*, 439 F.3d at 1096.

*Colwell* provides a useful comparison to Newberry's case.  Due to a cataract, Colwell was blind in his right eye.  He was unable to obtain surgery to remove it because Nevada's Department of Corrections believed that one good eye was enough for an inmate.  Noting medical providers' uniform finding that blindness in one eye is a serious medical condition, the panel said Nevada's policy was "the very definition of deliberate indifference." *Colwell*, 763 F.3d at 1068.  "As long as the eye remains untreated, Colwell continues to suffer blindness in his right eye, which is harm in and of itself, along with all of the other harms and dangers that flow from that." *Id*.

No one could dispute that Newberry sought treatment for pain.  Like Colwell, an inmate who is experiencing chronic or lasting pain will, without some

13

alleviation, "continue[] to suffer" pain, "which is harm in and of itself." *Colwell*, 763 F.3d at 1068.  But *Colwell* also differs from Newberry's case in important ways.  Both Colwell's blindness and its cure were obvious.  He had a cataract. Surgically removing it would restore his sight.  When an inmate seeks relief of chronic pain, the degree of his pain is difficult for a provider to ascertain, and the most effective and least risky way to control or end it is not obvious.  These facts are significant because "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference."  *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012).[2]

In *Snow*, some of the doctors who examined the inmate, and all the specialists, recommended total hip replacement surgery based on "severe degenerative changes in both of [Snow's] hips."  *Id.* at 983.  At one point, the recommendation became urgent.  Snow was taking such high doses of pain-control medication that his kidneys began to fail, a "potentially life threatening" situation. *Id.* at 983–84.  Two prison physicians dealt with that problem by putting Snow on Tylenol, codeine, an analgesic balm, and a daily dose of oxycodone.  *See id.* at 984.  Even with those medications, however, Snow had so much pain he could

---

[2] *Snow* was overruled on other grounds by *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc).

14

walk only a few feet without support.  He had not been able to go outside for two years, and he had "extreme difficulty" getting dressed.  *See id*.  Guards were prohibited from restraining him with ankle chains or ordering him to kneel.  *See id*. at 983.  Yet surgery was denied by a committee that "either gave no reason at all, or flatly told Snow that they would not approve any requests for joint replacement surgery."  *Id*. at 986.

The court held that the case did not necessarily reflect a mere difference of medical opinion.  A reasonable jury could find "that the decision of the non-treating, non-specialist physicians to repeatedly deny the recommendations for surgery was medically unacceptable under all of the circumstances."  *Id*. at 988.

In Newberry's case, therefore, the question is whether the treatments he claims were lacking—narcotic pain medications and surgery for his back and elbow, and physical therapy, bunk- and tier-restrictions, and a seat cushion for his back—were, first, so superior to the treatment he received that failing to provide them caused him "harm[] by the refusal [or delay] of treatment" as he requested, *see Colwell*, 763 F.3d at 1068, *Jett*, 439 F.3d at 1096; and, if so, whether a defendant knew that Newberry could not achieve adequate pain relief by way of the measures actually taken, *see Farmer*, 511 U.S. at 837.

Defendants neither concede nor deny that Newberry's pain was always a serious medical need.  They argue, however, that they were not deliberately

indifferent to his expressed needs for pain relief.

## 2.  What Treatment Did Newberry Receive?

Newberry arrived at the prison in 2018 with chronic back pain from a preexisting injury.[3]  In late November 2018, he injured his elbow in a fall.  As relevant to the Defendants, Newberry received treatment for these two distinct conditions between August 2018 and early spring of 2020.  He received treatment for other issues, too, such as allergies and hypertension.  Those visits are not included in the following chronology.  After December 2019, Newberry refused to see Dr. Rees or Dr. Hurst, the principal defendants involved in these allegations.

Defendants' affidavits and corresponding exhibits show the following.

Dr. Rees met Newberry on August 10, 2018.  Rees noted Newberry's chronic back pain, prescribed 200 milligrams of Celebrex twice daily as needed for pain, and requested Newberry's medical records for review.  *See* Rees Aff. (Doc. 142-3 at 6 ¶ 13); Defs. Ex. B (Doc. 142-11 at 9–11); *see also* Rees Aff. at 3 ¶¶ 5–6.

On August 23, 2018, someone noted that Newberry should be seen regarding his request for an epidural injection.  *See* Defs. Ex. B at 9.

On September 27, 2018, Rees saw Newberry.  Newberry asked to be

---

[3]  Newberry claimed this injury occurred when he slipped on icy steps at the prison in 2009.  *See* Am. Compl. (Doc. 6 at 5 ¶ IV(A)).  This incident appears to be the root of several claims he was not permitted to add to his pleading, concerning building codes, OSHA compliance, and so forth.  He was released from prison in 2016 but returned in 2018.

referred immediately to Brian Bradley, a certified registered nurse anesthetist, for an epidural injection.  *See id.* at 38.  Newberry said it had been two years since his last injection, and records confirmed the last occasion was December 15, 2016.  *See* Defs. Ex. B at 85–88.  Rees scheduled a review of Newberry's chart to examine his MRIs and to arrange a phone conference with Bradley.  In the meantime, to relieve Newberry's pain, Rees administered an intramuscular injection of methylprednisolone sodium succinate.  He also discontinued the Celebrex and prescribed 800 milligrams of ibuprofen three times daily as needed.  *See* Rees Aff. at 6–7 ¶ 14; Defs. Ex. B at 38; Defs. Ex. A (Doc. 142-10 at 3.)

On November 5, 2018, Newberry kited[4] another demand to see Bradley.  *See* Defs. Ex. I at 1.  On November 10, he asked for an appointment to "resolve my mental health + drug addictions problems + my PSDT symptoms."  *See* Defs. Ex. I at 51.

At some point, *see, e.g.*, Defs. Ex. B at 8, Rees reviewed Newberry's chart and consulted with Bradley.  On November 8, 2018, he referred Newberry to Bradley for an epidural injection.  *See* Rees Aff. at 7 ¶ 15; Defs. Ex. B at 8.  Rees attests that he "did not dictate or determine any medications administered by Bradley."  Rees Aff. at 8 ¶ 18.  Dr. Hurst attests that he "had no role in the

---

[4]  In this section, the generic term "kited" indicates that Newberry expressed a medical need.  Except where noted, the form used, the recipient, and the level of the grievance process are not relevant.

determination of Bradley's treatment." Hurst Aff. (Doc. 142-4 at 2 ¶ 15.)

On November 29, 2018, Newberry kited, "Due to my back injury,[5] the other day I was in so much pain I fell off my chair and landed on my right elbow. Now my elbow is swollen; I cannot bend my elbow, and the pain is severe." On December 1, he was told he would be scheduled to see someone. *See* Rees Aff. at 14–15 ¶¶ 43–44; Defs. Ex. B (Doc. 142-11 at 42.)

On November 30, Newberry kited for a monthly epidural and pain medications because he had "not received any pain meds for the back pain." Defs. Ex. I at 5. On December 1, Newberry kited the dentist for "adequate pain medication" for tooth pain. *Id.* at 52.

Also on December 1, Newberry saw a nurse about his elbow. She recorded that he had injured it two weeks previously and described it as "throbbing," "tender" and "annoying." Noting he was already taking ibuprofen for his back pain, the nurse told him to continue it, alternate ice and heat on the elbow, and send another kite if his symptoms worsened or did not improve. She also said she would schedule Newberry with a doctor within ten days. *See* Rees Aff. ¶ 43; Defs. Ex. B at 43.

On December 7, 2018, Newberry received epidural injections from Bradley.

---

[5] In his complaint, Newberry said he injured his elbow by curling weights at the gym. In his amended complaint, he said the chair he was sitting in "gave out." *See* Compl. (Doc. 1 at 7); Am. Compl. (Doc. 6 at 10.)

18

*See* Rees Aff. at 7 ¶ 17; Defs. Ex. B at 62–66.

On December 8, 2018, Newberry said he was experiencing tingling and numbness in his right arm and needed "treatments pain meds therapy."  He also said his right elbow was swollen and he "must have hurt it sometime."  A nurse saw him on December 9 and referred him for an appointment with a doctor.  *See* Defs. Ex. B at 44–45.

On December 9, Newberry kited to see a doctor for an x-ray, an ace bandage, pain medication, and physical therapy for his elbow.  *See* Defs. Ex. I at 10.

Dr. Hurst saw Newberry on December 13, 2018.  Newberry asked for an x-ray and "pain pills."  Defs. Ex. B at 37.  Dr. Hurst attests that, with "nothing accomplished," he terminated the appointment due to Newberry's behavior.  *See* Hurst Aff. (Doc. 142-4 at 2 ¶ 10); Defs. Ex. B at 37; *see also id.* at 107 (Newberry states Dr. Hurst "refused service").

The same day, December 13, Newberry submitted a kite stating he had waited four weeks to see someone and was told he was "hyper" when he finally saw a doctor.  He asked to see a different doctor and said he had numbness in his right hand, pain in his right elbow, and his "right hand is swollen all the time."  A week later, he was told he was scheduled to see someone.  *See* Defs. Ex. B at 109.  He also kited a request to be "seen as soon as possible, relieve pain with meds, a

19

cat scan." *See* Defs. Ex. I at 11.

On December 24, 2018, Newberry submitted another kite asking to be seen for his elbow.  A nurse saw him on December 25.  He told her he hit his elbow on concrete six weeks earlier, had an abortive appointment with Dr. Hurst, and wanted to see a provider again and get an x-ray.  On a scale of 1 to 10, he rated his pain as a 10.  The nurse noted no swelling or discoloration, a slightly decreased range of motion, slight swelling, and a normal or strong pulse above and below the joint, all indicating a referral was not needed.  She checked a box marked "severe pain/edema" as the reason for referral, referred him to a doctor, and noted he was requesting x-rays.  *See* Defs. Ex. B at 41.

Three days later, on December 27, 2018, Dr. Rees saw Newberry for a chronic-care appointment concerning hypertension.  Rees noted that Newberry "had epidural."  Rees avers that Newberry told him of his elbow pain, but Rees was not aware the pain followed an injury.  Rees diagnosed medial epicondylitis (which the Court understands to be tendon or muscle pain), discontinued the ibuprofen, and put Newberry on Celebrex twice a day as needed.  *See* Rees Aff. at 16 ¶ 48; Defs. Ex. B. at 89.

Three days after that, on December 30, 2018, Newberry wrote a kite stating that he had made numerous requests to see someone regarding his elbow injury and "still ha[d] <u>not</u> seen a provider!!!"  He asked to see an outside provider because

"MSP cannot seem to take care of this problem!" He said he had "numbing of the hand and I cannot bend my arm!" He was told he was scheduled. *See* Defs. Ex. B at 108.

On January 12, 2019, Newberry kited to see Bradley "for follow-up, different chair in my room, extra blankets, narcotics for pain." *See* Defs. Ex. I at 2. He also kited for an "x-ray, pain management, Tommy Copper ban" for his elbow. *See* Defs. Ex. I at 12.

On January 16, Newberry kited again, saying he had seen Dr. Hurst but "he refused service to my arm" and his elbow was still painful. He was told he would be rescheduled. *See* Defs. Ex. B at 107. He also kited for a follow-up with Bradley, who wanted to see him "for pain discussions." *See* Defs. Ex. I at 6.

On January 26, Newberry kited that the Celebrex was not working. He asked to be put back on ibuprofen and to see "a pain specialist in Anaconda to put a morphine pump in my back." *See* Defs. Ex. I at 61.

On January 31, 2019, Newberry saw a nurse. He reported that his back pain was "unchanged" and said he was supposed to return to Bradley a month after his December 7 appointment. *See* Defs. Ex. B at 35; *see also id.* at 65 (Bradley's notes indicating Newberry was "scheduled to follow up at my clinic in one month"). The nurse also noted tenderness and inability to fully extend the elbow. She discontinued the Celebrex, returned Newberry to ibuprofen, and ordered an x-

21

ray of the elbow.  *See* Defs. Ex. A at 6, Ex. B at 7, 35, 61.

Newberry was scheduled to have the x-ray on February 2, 2019.  Dr. Rees

explains that x-rays are performed by an outside provider, Big Sky Mobile

Imagining, which comes to the prison "several times per month."  *See* Rees Aff. at

21 ¶ 52.  For unknown reasons, the appointment was rescheduled for March 21 and

then April 4, 2019.  *See* Defs. Ex. B at 47–48.

On February 13, 2019, Newberry kited for another epidural and "a narcotic

med at PRN only when needed."  *See* Defs. Ex. I at 3.  He also kited that "in 13

weeks I have not been seen for the pain" in his elbow, said Celebrex did not work,

and again requested a copper band.  *See* Defs. Ex. I at 13.  And he kited another

request for dental care as he was "tired of this continual pain!!"  *See* Defs. Ex. I at

58.

On February 20, 2019, Newberry saw Bradley again, apparently for a

consultation.  According to Bradley's notes, Newberry said the December

injections did not provide enduring relief.  He reported "moderately severe sleep

disturbance and daytime pain" with particular difficulty climbing stairs.  He also

said he was using ibuprofen "when necessary . . . along with Celebrex."  Bradley

planned to repeat the injections, recommended 300 milligrams of gabapentin at

bedtime, and noted he would "like to see [Newberry] on a lower bunk and on the

lowest floor as to avoid stair climbing."  Defs. Ex. B at 57–58; *see also* Rees Aff.

at 8 ¶ 20.

On February 21, 2019, Newberry kited that the prison "failed to provide proper medical care, + proper pain meds."  Defs. Ex. I at 7.

On March 1, 2019, Newberry asked to see "an outside bone specialist" for his elbow.  He said his "arm is not improving and worse and worse, continual pain and I can hardly use the arm" and it "wakes me up with pain."  The response noted he had been evaluated after the injury by Dr. Hurst, there was no order for a specialist referral, and he would be monitored and evaluated by MSP providers. *See* Defs. Ex. B at 106.

On March 6, Newberry kited his refusal to see Dr. Hurst and asked to see "a bone specialist on the outside, get real pain meds, + a brace for my arm."  Defs. Ex. I at 14.

On March 11, 2019, Newberry kited for an epidural and was told he was scheduled for one.  *See* Defs. Ex. B at 105.

On March 26, 2019, the Special Needs Committee ("SNC") met and discussed Newberry's requests for a lower-bunk and lower-tier cell designation and a seat cushion.  It denied all three requests.  Newberry was advised he could direct his bunk and tier requests to his unit manager.  *See* Scharf Aff. (Doc. 142-7 at 11–12 ¶ 32–36); Defs. Ex. C (Doc. 142-12 at 6.)

Also on March 26, Newberry submitted a grievance requesting a "narcotic

23

nerve blocker" as "prescribed" by Bradley.  His request was denied.  *See* Defs. Ex.

I (Doc. 142-18 at 17); *see also* Reich Aff. (Doc. 142-8 at 9 ¶ 32.)  He also kited a

demand for another epidural.  *See* Defs. Ex. I at 20.

On March 28, 2019, Newberry received from Bradley the same injections he

had received on December 7, 2018.  *See* Rees Aff. at 8 ¶ 21; Defs. Ex. B at 50–56.

Bradley noted that he obtained a "better dye flow study today" and Newberry

"should do well."  Bradley administered "no opioids or benzo's" but recommended

300 milligrams of gabapentin per day, up to 1200 milligrams, for "neuropathic

pain."  Defs. Ex. B at 50.[6]

On March 29, Newberry kited a "reflection of when Dr. Hurst ordered me

out of his office" and asked to see an outside provider "due to over 20 weeks of

inaction, no x-rays, no elbow bands."  *See* Defs. Ex. I at 15.

On April 2, 2019, Newberry asserted his right arm had been painful for 21

weeks and he had had no x-ray, brace, or pain medications.  He stated that anti-

inflammatory medication (and an illegible word, possibly Celebrex) did not help.

He again asked to see an outside provider.  The response noted he would have an

x-ray on April 4.  *See* Defs. Ex. B at 104.

---

[6]  It appears that someone later wrote on the record, on March 29, 2019, "gabapentin not an option in DOC cymbalta or trileptal will be used." Defs. Ex. B at 50.  Another handwritten note indicates there were "no objective findings" suggesting lumbosacral radiculopathy at L5 but "subj. radiculopathic symptoms" were present. *Id*. at 52.

24

Also on April 2, Newberry said the epidural administered on March 28 "did not work" and asked, "Did they not put any pain reliever in the epidural and just put steroids?"  He was told he had an appointment pending.  *See* Defs. Ex. I (Doc. 142-18 at 32.)

Three x-rays of Newberry's elbow were taken on April 4, 2019.  Newberry had a "well-corticated ossific fragment" from an "old avulsion fracture."  Dr. Rees attests that "[a]vulsion fractures typically require no treatment except anti-inflammatories and alternating ice and heat," as had been prescribed in December and January, rather than surgical intervention.  *See* Rees Aff. at 17 ¶¶ 55–56; Defs. Ex. B at 90.

On April 4, 2019, Newberry's unit manager granted his request for a lower-tier cell and a lower bunk.  *See* Bouley Aff. (Doc. 142-9 at 2–3 ¶¶ 6–9.)

On April 10, Newberry filed two grievances and an informal resolution form concerning his back pain.  All three demanded another epidural, "one that has the medication of years ago when they actually worked," because the March 28 injection "did not work."  Newberry said his "neuro-surgeon ordered a nerve blocker for me," gabapentin.[7]  *See* Defs. Ex. I at 18, 21, 35.

---

[7]  In response, on April 24, Newberry was told another epidural was "not medically indicated" and a "new treatment plan" had been initiated.  On May 3, he was told he had a follow-up appointment scheduled and was "on a medication for nerve pain called trileptal. Please give it time to work."  Grievance Forms (Doc. 142-18 at 18, 21.)

Rees saw Newberry on April 15, 2019.  They discussed only his back pain. *See* Defs. Ex. B at 6, 34.  Rees's notes indicate that Newberry said he received "no relief whatsoever" from Bradley's March 28 injections and requested another appointment with him.  Newberry also said Cymbalta did not work for him.  Rees noted he would try trileptal instead of gabapentin and Cymbalta.  *See* Defs. Ex. B at 34.  Rees attests that gabapentin is prone to abuse by persons who may hoard or misuse it and trileptal is "a superior neuromodulator, based on clinical trials." Rees Aff. at 8–9 ¶ 22.  Rees scheduled a follow-up in six weeks to assess Newberry's response.  *See* Defs. Ex. B at 34.

On April 17, Newberry kited again to see an outside provider for his elbow and stated he had "had this pain for 6 months."  *See* Defs. Ex. I at 16.  On April 30, Newberry submitted two grievances demanding the same "spinal epidural that I had years ago."  Defs. Ex. I at 27, 37.[8]

Dr. Rees asserts that he asked, on May 5, 2019, that Newberry be scheduled to see him to discuss the elbow x-rays, *see* Rees Aff. at 18 ¶ 57 (citing Defs. Ex. B at 6), although the exhibit does not appear to say so.  Regardless, on May 11, 2019, Newberry saw a nurse and again reported his elbow pain at 10 on a scale of 1 to 10.  The nurse noted limited range of motion and crepitus and referred Newberry to

---

[8]  The response noted that ibuprofen and Tylenol were available through the canteen and also that Newberry was "on medications to alleviate discomfort."  Defs. Ex. I at 27.

see a provider within ten days.  *See* Defs. Ex. B at 39.

On May 14, Newberry submitted three kites.  He said the trileptal was not working and that Dr. Rees had said in mid-April another epidural would be scheduled but none had occurred.  He said he had "severe daily problems walking, sneezing, coughing, laughing, etc."  He asked, "If I am being monitored as medical claims, then why am I never seen?"  *See* Defs. Ex. I at 19, 22, 28.

On May 17, Newberry saw a nurse concerning his allergies.  He asked for a follow-up appointment to discuss the x-ray results and another spinal epidural for his back.  The nurse asked that both issues be scheduled.  *See* Defs. Ex. B at 5, 33.

On May 23, Newberry submitted an informal resolution form saying that, on April 15, Rees had "said he was going to order me off site to see Dr. Bryan for another spinal epidural" "like Dr. Kohut and Dr. Piranian prescribed which had actual pain medicine in it!"  Defs. Ex. I at 38.

Newberry was scheduled to see a provider on May 31, but the appointment was reset for June 18 due to a lockdown.  *See* Rees Aff. at 18 ¶ 58; Defs. Ex. B at 32.  On June 11, 2019, Newberry was told he was "scheduled with a provider to discuss" his complaint of May 23.  *See* Defs. Ex. I at 38.

On June 13, Newberry submitted an "Emergency Grievance to Command Post" stating that, on May 15, 2019, the Warden had approved his request for a spinal epidural with pain medication in it.  *See* Defs. Ex. I at 36.  On June 15, he

27

again stated, "I want a spinal epidural with pain medication in it.  Enough

discussing!!  It's over!"  Defs. Ex. I. at 39.  On June 17, the response to the June 13

grievance indicated the situation was not an emergency and Newberry was

scheduled to see a provider to address his back pain.  *See* Defs. Ex. I at 36.

Rees saw Newberry on June 18, 2019.  Newberry said he had stopped taking

the trileptal because it did not work.  He requested another appointment with

Bradley.  Rees referred Newberry for treatment by Bradley.  *See* Rees Aff. at 9 ¶

23; Defs. Ex. B at 4, 29, 31.  Newberry did not mention his elbow and, when Dr.

Rees attempted to talk to him about the x-rays, declined to discuss the subject.  Dr.

Rees scheduled a follow-up for six weeks later.  *See* Rees Aff. at 18 ¶ 59; Defs. Ex.

B at 31, 29.

On June 20, Newberry filed a grievance appeal requesting "a stronger pain

medication such as Vicodin, or lowertabs [Lortab] . . . which I can take at PRN."

Defs. Ex. I at 23.

On July 10, 2019, Newberry submitted a grievance appeal seeking

clarification of whether he was going to receive a spinal epidural with pain

medication in it or not.  He concluded, "All I want is simple – (Pain Relief)!!"

Defs. Ex. I at 40.

On July 12, 2019, Newberry met with a nurse.  They discussed the elbow x-

rays.  Newberry reported discomfort with some movement and requested an

orthopedic consult.  The nurse discussed the issue with Dr. Rees and scheduled a chart review.  *See* Rees Aff. at 19 ¶ 60; Defs. Ex. B at 28.

On July 20, Newberry said he was told he had an appointment with Bradley but had been waiting five weeks and two days.  *See* Defs. Ex. I at 44.

On July 26, 2019, Rees saw Newberry.  Newberry again requested another appointment with Bradley.  Rees had already referred him and also consulted with Bradley himself.  Rees administered two intramuscular injections, including Kenalog, for pain relief.  *See* Rees Aff. at 9 ¶ 24; Defs. Ex. B at 4, 27; Defs. Ex. A at 13–14; Defs. Ex. I at 40.  Based on Newberry's continued pain and request to see an orthopedic surgeon about his elbow, Rees attempted to call Dr. Bertrand Jones in Anaconda but was unable to reach him.  He asked that another chart review be scheduled for the "week that I get back ~ 8/8/19" to follow up on the call to Dr. Jones.  *See* Rees Aff. at 19 ¶ 61; Defs. Ex. B at 3, 27.

On August 7, 2019, Newberry submitted a grievance appeal stating he had received "spinals with Kenalog in them" for 12 years,[9] but "the last 2" did not have

---

[9]  For what it is worth, on April 1, 2021, Newberry submitted a "medicine information sheet," apparently issued on April 3, 2019, indicating that "[v]ery bad health problems have happened when drugs like" triamcinolone (brand name including phrase "Arze-Ject-A Kenalog P_Care K40") "have been given into the spine (epidural)."  These problems "include paralysis, loss of eyesight, stroke, and sometimes death."  As a result, "[t]hese drugs are not approved" for injection into the spine.  (*See* Doc. 163-1 at 177–178.)  The same information was issued for methylprednisolone, *see id.* at 175, but Rees and Hurst administered the drug by intramuscular injection, not in an epidural. *See* Rees Aff. at 6–7 ¶ 14, 10 ¶ 27; Hurst Aff. (Doc. 142-4 at 2 ¶ 14); Defs. Ex. B at 23, 38.

Kenalog in them and were "completely ineffective." Defs. Ex. I at 41.

On August 15, 2019, Newberry saw Bradley and received epidural injections in a slightly different location in hopes of improving his response. *See* Rees Aff. at 9–10 ¶ 25; Defs. Ex. B at 81–84. Bradley noted, "Should [Newberry] not see significant improvement it is unlikely that further injections would improve his situation. Consider surgical consult." Defs. Ex B at 84.

Rees reviewed Newberry's chart on September 9, 2019. He noted that Bradley was waiting to see whether the August 15 injections were effective. *See* Rees Aff. at 10 ¶ 26. Rees also spoke with Dr. Jones, who agreed to review the elbow x-rays. *See* Rees Aff. at 19 ¶ 62; Defs. Ex. B at 26.

On October 19, 2019, Newberry said Dr. Hurst told him to "send him a kite" to request a pain-relief injection for his back. Newberry said he did so but no action had been taken and he was "in severe pain." He concluded, "I want the damn shot!!" *See* Defs. Ex. I at 45.

On October 23, 2019, Dr. Hurst administered an intramuscular injection of methylprednisolone sodium succinate. *See* Rees Aff. at 10 ¶ 27; Hurst Aff. at 2 ¶ 14; Defs. Ex. A at 17; Defs. Ex. B at 23.

On October 25, 2019, Rees saw Newberry. He administered the intramuscular Kenalog injection that Hurst had not given on the 23rd, prescribed Benadryl to help Newberry sleep, and referred him for another visit with Bradley.

30

*See* Rees Aff. at 10 ¶ 28; Defs. Ex. B at 3, 22; Defs. Ex. A at 17.  He also ordered

an appointment for Newberry with Dr. Jones but did not consider the elbow issue

urgent.  *See* Rees Aff. at 19 ¶ 63; Defs. Ex. B at 3, 22.  This visit proved to be

Newberry's last with Dr. Rees.

On November 13, 2019, Newberry saw Bradley for a consultation.  Bradley

noted he would try Kenalog (triamcinolone) instead of dexamethasone the next

time he administered an epidural.  Rees inferred Bradley would again assess the

effectiveness of the change.  Bradley's notes again indicated surgery might be

considered if the injections failed to provide relief.  *See* Rees Aff. at 10–11 ¶ 29;

Defs. Ex. B at 46.

On December 5, 2019, Newberry kited for a "spinal epidural with Kenalog

in it."  *See* Defs. Ex. I at 83.

On December 11, 2019, Newberry asked to have all of his appointments

with Dr. Rees and Dr. Hurst rescheduled with another provider "as I have a current

lawsuit pending" against them.  He was told that he would "continue to be

scheduled with providers."  Defs. Ex. B at 103.

On the same day, Newberry saw a different prison physician, Dr. Corson.

She ordered physical therapy and referred Newberry for another appointment with

Bradley.  *See* Rees Aff. at 11 ¶¶ 30–31; Defs. Ex. B at 2, 21.  Bradley saw

Newberry the following day and evidently administered injections.  *See* Defs. Ex.

31

B at 135.  Newberry also began seeing a physical therapist.  *See* Defs. Ex. B at 136.

On January 7, 2020, Newberry kited for a spinal epidural "not triamcinolone, but Kenalog."  *See* Defs. Ex. I at 87.  These are the generic name and the brand name, respectively, for one medication.  *See* Rees Aff. at 10 ¶ 29.

On January 15, 2020, Newberry had an appointment scheduled, but a nurse noted he "walked out" when he learned he would see Dr. Hurst.  *See* Defs. Ex. B at 20.

On February 6, 2020, Newberry asked not to be scheduled with Dr. Rees or Dr. Hurst in future.  On February 19, 2020, when Newberry requested another appointment with Bradley, prison staff learned that he was no longer practicing. *See* Rees Aff. at 11–12 ¶¶ 33–34; Defs. Ex. B at 102.

On February 19, Newberry asked for another spinal epidural.  On February 25, he was told that Bradley was "no longer doing injections in Anaconda" but an appointment would be scheduled when new providers were available.  *See* Defs. Ex. B at 101.

On February 23, 2020, Newberry kited for another epidural "with stronger medication," as it had been "nearly 4 months" since his last appointment.  *See* Defs. Ex. I at 49.

On February 25, 2020, Newberry submitted three kites.  He said he needed

32

"more physical therapy," asked to see an outside provider for his elbow, and asked Dr. Corson to set an appointment for him with Bradley for a "spinal with a more effective pain killer." He also asked to see Dr. Corson instead of Drs. Rees or Hurst because "my attorney said do not see them." The response informed him that Dr. Corson would not be at the prison for the "next 3 months" and he would be scheduled with "available providers." *See* Defs. Ex. B at 98–100.

On March 4, Newberry received a response to his February 23 kite. He was told that "the last spinal injections were documented as non-effective." A "new plan of care was formulated" and appeared to show "improvement with current plan and physical therapy." Newberry was advised he was scheduled to see Dr. Rees in early March. *See* Defs. Ex. I at 49; *see also* Defs. Ex. B at 120–134, 136 (physical therapist's reports).

On the same day, Newberry again kited for a spinal epidural with Bradley and asked to "have Dr. Bradley put a stronger pain medicine in my back." *See* Defs. Ex. I at 50.

Treatment continued with other medical providers in the MSP infirmary. *See* Rees Aff. at 12 ¶ 35. As of July 30, 2020, Newberry was no longer scheduled with Dr. Rees or Dr. Hurst. *See id.* at 20 ¶ 65; Defs. Ex. B at 110. An August 2020 x-ray of Newberry's lumbosacral spine "did not note any significant abnormalities." *See* Rees Aff. at 12 ¶¶ 35–36. On several occasions, Newberry

failed to appear or walked out of appointments.  *See* Defs. Ex. B at 14–17, 112–117.

### 3.  Is the Element of Deliberate Indifference Genuinely Disputed?

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

#### (a)  Back Pain

Newberry's amended complaint contended that Bradley told Rees and the other Defendants that Newberry "needed" surgery and "ordered" gabapentin for his pain relief.  *See* Am. Compl. (Doc. 6 at 12, 15–16) (describing Bradley as a neurologist or neurosurgeon).  Newberry also contended that Rees prohibited Bradley from administering fentanyl in the spinal epidural injections, which had worked for Newberry in the past.  *See* Am. Compl. at 12, 15–16; *see also* Pl. Disclosure Stmt. (Doc. 23 at 2 ¶¶ 3–5, 6 ¶ 31.)

To support these allegations, Newberry has introduced no affidavit, deposition testimony, or other evidence, such as discovery responses, from Bradley, Rees, or anyone else with personal knowledge.  Newberry's Statement of Disputed Facts (Doc. 151) lacks evidentiary support and does not comply with L.R. 56.1(b).  *See also* Fed. R. Civ. P. 56(c)(1); *Celotex Corp.*, 477 U.S. at 324. His surreply (Doc. 168) is unauthorized, *see* L.R. 7.1(d)(1)(D), and will not be

34

considered.

Rees attests that he did not determine what medications outside providers administered.[10]  *See* Rees Aff. (Doc. 142-3 at 8 ¶ 18.)  This evidence is undisputed. Newberry points to Bradley's report from March 28, 2019, which contains a handwritten note that gabapentin is not an option for the Department of Corrections.  *See* Pl. Resp. (Doc. 145 at 4); Def. Ex. B at 50.  But Newberry does not demonstrate that Dr. Rees made the decision or the notation or, more importantly, that the decision was medically unreasonable.

The evidence shows that Bradley did not prescribe gabapentin but recommended it.  *See* Rees Aff. at 8 ¶¶ 20, 22; Defs. Ex. B at 58 (Feb. 20, 2019), 50 (Mar. 28, 2019).  Rees attests that the drugs he prescribed for Newberry's pain relief were more effective and less prone to abuse.  *See* Rees Aff. at 8–9 ¶ 22.  This evidence is undisputed.

The evidence shows that Bradley did not recommend surgery.[11]  He noted that a surgical consult should be considered if the epidural injections failed to

_____

[10]  Even assuming, for the sake of argument and against the evidence, *see, e.g.*, Defs. Ex. I (Doc. 142-18 at 24), that DOC policy constrained Bradley to avoid opiates, such a policy is acceptable in general.  *See, e.g.*, *Shiira v. Hawaii*, 706 Fed. App'x 436, 437–38 (9th Cir. 2017); *Berry v. Lee*, 983 F.2d 1075 (9th Cir. 1992).  Newberry points to no evidence it was medically unacceptable in his specific case.  With or without a prior history of abuse by an individual inmate, avoiding the aggravation or creation of addiction to drugs of abuse is itself a serious medical need.

[11]  The Court does not know whether recommendations for surgery or prescriptive authority fall within a certified registered nurse anesthetist's permitted practice.

35

relieve Newberry's pain.  *See* Defs. Ex. B at 84 (Aug. 15, 2019), 46 (Nov. 13,

2019).  Rees attests he understood Bradley was trying different approaches to

determine whether epidurals might still be effective before he would recommend

any other course of treatment.  *See* Rees Aff. at 10 ¶ 26, 10–11 ¶ 29.  This evidence

is undisputed.

Newberry submitted documents purportedly received from Dr. Day, who

saw him in 2016.  On March 3, 2016, Dr. Day noted that, depending on various test

results, Newberry should follow up "for possible left L5-S1 foraminotomy."  (Doc.

159-1 at 22.)  Dr. Day's records do not add weight to Newberry's claims of pain,

which are not disputed, or to Bradley's similar remark that a surgical consultation

might be appropriate if the epidurals proved ineffective.  They do not support an

inference that Defendants were deliberately indifferent to Newberry's expressions

of pain.

Newberry submitted statements from 20 inmates.  *See, e.g.*, Statements

(Doc. 152-1 at 19, 27, 35, 36, 39) (statements of Demichelis, McNamara, Allard,

Sieler).  The reported remarks, claims that their own pain is not adequately

controlled, and reported "weeks"-long delays in treatment evidence indifference

and verbal harassment by unidentified medical and prison staff.  But they are not

evidence that a defendant in Newberry's case was deliberately indifferent.

The records of Newberry's case indicate some periods of delay in treating

his back pain, such as that between his initial meeting with Dr. Rees on August 10, 2018, and administration of the first epidural on December 7, 2018.  But Rees saw Newberry on September 27, giving an intramuscular injection and prescribing medications to relieve his pain.  Newberry received epidural injections on December 7, 2018, March 28, 2019, August 15, 2019, and December 12, 2019, a regular course of treatment every four to four and a half months.  Dr. Rees tried different medications to reduce inflammation or ameliorate pain throughout his time treating Newberry.  Newberry points to no evidence that these efforts were medically unreasonable.  Just as good faith does not guarantee competence or successful treatment, lack of success does not indicate incompetence or bad faith. The fact that Newberry's pain was not eliminated does not support an inference that anyone was deliberately indifferent to it.

Finally, Newberry requested subpoenas to obtain MRI and x-ray images in photographic form and written records from outside treatment providers, including Bradley.[12]  The request is moot.  Defendants submitted Bradley's written records in

---

[12]  Judge Johnston granted the request for subpoenas, but problems arose when Newberry submitted proposed subpoenas. *See* Mot. for Subpoenas (Doc. 57, 57-5); Order (Doc. 92 at 25–26, 33 ¶ 14) (granting motion and requiring Newberry to complete form subpoenas); Pl. Prop. Subpoenas (Doc. 95); Order (Doc. 96 at 3–5) (rejecting subpoenas naming the court as the place of production); Pl. Prop. Subpoenas (Doc. 103); Order (Doc. 111 at 1–2) (allowing correction of defective subpoenas); Pl. Mot. for Court's Consideration (Doc. 120) (requesting that court serve as the place of production).  As Judge Johnston pointed out on January 7, 2021, *see* Order (Doc. 92 at 21, 26), Newberry could have requested Bradley's records from Bradley at any time, without a subpoena.  They are Newberry's own records.

connection with each of Newberry's appointments with him.  *See* Defs. Ex. B at

62–66 (Dec. 7, 2018), 57–60 (Feb. 20, 2019), 50–56 (Mar. 28, 2019), 81–84 (Aug.

15, 2019), 46 (consultation of Nov. 13, 2019), 135 (Dec. 12, 2019).  The latter

record may be incomplete, as Dr. Rees points out.  *See* Rees Aff. at 11 ¶ 31.  On

other occasions when Bradley administered epidurals, his reports consist of four or

five pages.  The December 2019 report states injections were administered but

consists of just one page.  Even so, other evidence shows the December 2019

treatment failed to help Newberry and Defendants tried a new approach.

Newberry's pain improved.  And he refused to see Defendants Rees or Hurst again.

*See* Rees Aff. at 10–12 ¶¶ 29–35; Defs. Ex. I at 49; *see also* Defs. Ex. B at 120–

134, 136 (physical therapist's reports).

Defendants' evidence shows they were not deliberately indifferent to

Newberry's back pain.  He points to no competent evidence to the contrary.

Defendants are entitled to summary judgment.

### (b)  Elbow Pain

Newberry's amended complaint contended that Dr. Hurst was deliberately

indifferent to his elbow injury.  He asserted that Hurst knew bending or moving the

elbow caused Newberry pain but did not order an MRI or X-ray.  Newberry's pain

continued.  In April 2019, an X-ray showed the bone was broken.  In May 2019,

Dr. Rees told Newberry he would be able to see a bone specialist outside the

prison, but Newberry had not seen one at least as of September 2020.  Newberry contended that he requires surgery and suffered as a result of its delay.  *See* Am. Compl. at 10; Pl. Disclosure Stmt. at 4–5 ¶¶ 20–21.

Newberry has introduced no affidavit, deposition testimony, or other evidence showing that he required surgery to repair his elbow.  Newberry did not see a provider in January 2019 until January 31, but in December 2018, he saw a nurse three times and talked to two doctors about his elbow.  This evidence is undisputed.  There was significant delay, from January 31 to April 4, 2019, in obtaining x-rays, but Dr. Rees avers that "[a]vulsion fractures typically require no treatment except anti-inflammatories and alternating ice and heat" rather than surgical intervention.  *See* Rees Aff. at 17 ¶¶ 55–56; Defs. Ex. B at 90.  This evidence, too, is undisputed.  Therefore, delays did not cause Newberry to experience pain beyond that entailed with the nature of the injury.  And there is no evidence that surgery was necessary, or would even be helpful, or that the prescribed course of treatment was medically unreasonable.

Defendants' evidence shows they were not deliberately indifferent to Newberry's elbow pain.  He points to no competent evidence to the contrary. Defendants are entitled to summary judgment.

### (c)  Physical Therapy

Newberry contended that Defendants Winner and Hiner denied him physical

therapy.  *See* Am. Compl. at 6 ¶ 4; Pl. Disclosure Stmt. at 4 ¶ 13.  Both Defendants

attest that they do not have the authority to grant or deny treatment by outside

providers.  *See* Hiner Aff. (Doc. 142-1 at 2 ¶¶ 4–6); Winner Aff. (Doc. 142-3 at 2–

3 ¶¶ 5–6.)  Newberry points to no evidence to the contrary.  Defendants are entitled

to summary judgment.

### (d) *Tier- and Bunk-Restrictions and Seat Cushion*

Newberry seems to raise these issues only under the Americans with

Disabilities Act.  In an abundance of caution, the Court will also consider them

under the Eighth Amendment.

Newberry alleges that Bradley told prison officials in February 2019 that

Newberry needed a bottom-bunk and bottom-tier-cell designation and also required

a sitting cushion to avoid back pain.  *See* Am. Compl. at 5, 12–13.

The undisputed evidence shows that Newberry received a bottom bunk

placement in a ground-floor cell a few days after he requested it from his unit

manager.  Newberry points to no evidence to the contrary.  The record fails to

support an inference that mere lack of a seat cushion caused Newberry to suffer

serious and avoidable pain or that any Defendant knew this to be the case.

Defendants are entitled to summary judgment.

### 4.  Conclusion

Newberry points to no evidence showing that a defendant failed or refused

to take his pain seriously or treated it in a medically unacceptable manner.

Defendants are entitled to summary judgment on all claims under the Eighth

Amendment.

### D.  Americans with Disabilities Act[13]

To prove a claim under the Americans with Disabilities Act, a plaintiff must

show "(1) he is an individual with a disability; (2) he is otherwise qualified to

participate in or receive the benefit of some public entity's services, programs, or

activities; (3) he was . . . denied the benefits of the public entity's services . . . and

(4) [the] denial of benefits . . . was by reason of [his] disability." *McGary v. City

of Portland*, 386 F.3d 1289, 1265 (9th Cir. 2004) (internal quotation marks and

citations omitted).  In context, Newberry must show that his pain substantially

limits his ability to sit, reach a top bunk, or climb stairs and that a defendant's

failure to provide reasonable accommodations in the form of bunk- and tier-

restrictions and/or a cushion "disproportionately burdens" his experience of prison

housing as compared to nondisabled prisoners.  *See, e.g.*, *Rodde v. Bonta*, 357 F.3d

---

[13]  The ADA claims support only injunctive relief.  *See* 42 U.S.C. §§ 12132, 12131(1); *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002) (no ADA claim against individuals under 42 U.S.C. § 1983); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc) (no ADA claim against individuals).  Newberry now resides at Crossroads Correctional Center, a private prison under contract with the Montana Department of Corrections.  His transfer raises the issue of whether his claims for injunctive relief are moot.  As Defendant Winner is the DOC's Clinical Services Director, *see* Winner Aff. (Doc. 142-2) at 2 ¶ 4, she appears to remain capable of providing injunctive relief if Newberry is entitled to it.  And neither party has suggested the ADA claims are moot.

988, 998 (9th Cir. 2004); *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996).

Newberry complains that the Special Needs Committee ("SNC") denied his requests for lower-bunk and lower-tier restrictions and a chair cushion, contrary to Bradley's recommendation.  Defendants Rees and Scharf sit on the committee.  As to the bunk and tier restrictions, the SNC's denial advised Newberry to "work out" these accommodations with his unit manager.  He did and was promptly reassigned to a lower bunk on a lower tier.  *See, e.g.*, Bouley Aff. (Doc. 142-9 at 2–3 ¶¶ 6–9.) These facts require no further discussion.

Newberry did not receive a cushion.  Again, however, his request for one arrived at the SNC via Newberry's health services requests based on Bradley's recommendation.  The role of the SNC is to decide whether specific items or placements are medically necessary for a given inmate, not whether an item or placement would be a reasonable accommodation under the Americans with Disabilities Act.  The ADA does not compel the prison to carry out all recommendations made by a medical provider.  The SNC provides cushions only to inmates who use wheelchairs.  Newberry does not, so he did not receive a cushion.

By a separate process, Newberry and other inmates were able to request reasonable accommodations under the ADA.  *See* Scharf Aff. (Doc. 142-7 at 10–12

42

¶¶ 31–35); Defs. Ex. C at 6, 18; Defs. Ex. D (Doc. 142-13 at 2–3 § IV(C)(1)–(3)). There is no evidence that Newberry did so.  Nor has he shown that he is unable fully to participate in programs or services because he cannot sit or remain seated.

Defendants are entitled to summary judgment on Newberry's ADA claims.

### E.  Defendants Guyer and Michael

Newberry alleges that Defendants Guyer and Michael are liable because they knew of ongoing violations of his rights and failed to intervene to stop them or prevent more.  Defendants introduce evidence that neither Guyer nor Michael knew of Newberry's condition or his complaints.  *See* Scharf Aff. (Doc. 142-7 at 6–7 ¶ 16–17); Guyer Decl. (Doc. 142-5 at 4); Michael Decl. (Doc. 142-6 at 2–3 ¶¶ 4–7).  Newberry points to no evidence to the contrary.  Defendants are entitled to summary judgment.

### F.  Conclusion:  Defendants' Motion for Summary Judgment

Defendants have introduced evidence proving they are entitled to summary judgment on each claim and as to each defendant.  Newberry has not pointed to evidence that could rebut their evidence.

## IV.  Plaintiff's Remaining Motions

The Court has reviewed all of Newberry's submissions since January 7, 2021.  A few are discussed above, in Part III(C)(3)(a).  A few more require specific mention.

Two motions Newberry has *not* made are relevant to the following discussion.  First, Newberry did not timely request an extension of time to submit discovery requests or to extend discovery.  Discovery closed on December 18, 2020.  *See* Scheduling Order (Doc. 13 at 7 ¶ II(A)(4)).  All requests had to be served a month before that, on or before November 13, 2020.  *See id.* at 7 ¶ II(A)(2).  Newberry filed a motion on November 16, seeking leave to serve additional requests.  He failed to explain what additional discovery he needed and was unable to obtain.  Judge Johnston denied his motion, noting, however, that Defendants must make certain supplemental disclosures.  *See* Order (Doc. 92 at 22–23, 30 ¶ 1).

Second, Newberry did not file an appropriate motion to compel Defendants to respond to a discovery request or to make or supplement initial disclosures pursuant to the Scheduling Order.  *See* Scheduling Order (Doc. 13 at 1–3 ¶¶ I(A)(1)–(2), (4)).  Judge Johnston's Order of January 7, 2021, specifically drew Newberry's attention to what he must do to file a proper motion to compel.  *See* Order (Doc. 92 at 27–28) (citing L.R. 26.3(c)(2)).  That Order also extended the deadline for filing pretrial motions from January 15, 2021, to February 22, 2021.  *See id.* at 33 ¶ 23.  Neither before nor after the motions deadline has Newberry identified an improper or incomplete response or disclosure by Defendants.

### A.  Discovery

Some of Newberry's motions suggest the Defendants failed to produce all the relevant medical records or failed to respond appropriately to discovery.  *See, e.g.*, Mot. (Doc. 99 at 1) ("The Plaintiff has filed for his discovery but to no avail"); Mot. (Doc. 102 at 1–2); Mot (Doc. 121 at 2 ¶ 9).  On the other hand, he appears to say Defendants produced more than 400 pages of medical records dating from 2018 through 2020 but did not provide records from his time at the prison between 2008 and 2018.  *See* Mot. (Doc. 102 at 2.)  The time frame of 2018 to 2020 is proportional to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1).  Newberry does not suggest any of those records are missing.

Nor does Newberry explain why records created during his previous stay in prison, ending in 2016, prove the Defendants in this case were deliberately indifferent to his serious medical needs.  Dr. Day's records are discussed above.  They do not prove the Defendants were deliberately indifferent to Newberry's complaints of pain in 2018, 2019, and 2020, and Newberry offers no reason to believe other providers' records would do so.

Newberry fails to request, much less justify, reopening or extension of discovery.  Motions seeking additional discovery or disclosures by the Defendants, *see, e.g.*, Mot. (Docs. 167, 167-1), Mot. (Doc. 174), are denied.

### B.  Subpoena Requests

In Part III(C)(3)(a), above, the Court addressed Newberry's request for subpoenas to obtain his own medical records from outside providers.  As the subpoenas he requested were not issued, the Court will not enforce them.  *See* Mot. (Doc. 157 at 1.)

To the extent Newberry believes he could have subpoenaed affidavits or expert reports, he is mistaken.  Subpoenas are used to obtain existing documents. New statements from non-parties can be taken by deposition but not compelled by subpoena.  It is too late for Newberry to take depositions, as discovery closed on December 18, 2020.  *See* Scheduling Order (Doc. 13 at 7 ¶ II(A)(4)).  Had Newberry timely made his expert disclosures, *see id.* at 7 ¶ II(A)(3), or timely requested affidavits from fact witnesses, he would have had reports or affidavits to submit in response to Defendants' motion.  He did not submit either.

Newberry's subpoena requests for video footage of prison employees' compliance with CDC protocols, *see* Mot. for Subpoena (Doc. 114, 114-1), are not relevant to the case.  His proposed subpoena for his prison medical records since 2008, *see* Mot. for Subpoena (Doc. 115, 115-1), is redundant to initial and supplemental disclosures and discovery between the parties, and so is untimely.  It is also overbroad.

46

### C.  Newberry's Personal Notes

Newberry submitted "personal notes" he "kept through out this entire process."  Mot. (Doc. 135 at 1); *see also* Mot. (Doc. 180).  The notes do not evidence a defendant's deliberate indifference.[14]

### D.  Motions for Leave to File Exhibits

On several occasions, Newberry has requested leave to file evidence or exhibits.  *See, e.g.*, Mots. to Enter Kites & Grievances (Docs. 163, 164, 165 at 1); *see also* Docs. 163-1 (221 pages), 164-1 (243 pages), 165-1 (175 pages).

Newberry knows he must connect his exhibits to specific issues before the Court.  *See, e.g.*, Order (Doc. 92 at 21–22); D. Mont. L.R. 7.2 (Dec. 1, 2019); Rules Packet (Doc. 13-2 at 20–21.)  He fails to do so.  His exhibits also lack foundation, authentication, and explanation by competent witnesses.  The motions for leave to file lack merit.

### E.  Motion for Summary Judgment

On January 27, 2021, Newberry apparently resubmitted (Docs. 112, 112-1, 112-2, 113) the documents he filed in connection with the summary judgment motion he filed on December 2, 2020 (Docs. 56, 86, 87).  The several documents labeled "Statement of Undisputed Facts" fail to comply with L.R. 56.1(a)(1)–(3),

---

[14]  The first two pages of Newberry's first submission display peculiar temporal characteristics.  *See* Personal Notes (Doc. 135-1 at 1–2.)

*see* Statements (Doc. 113 at 1–29), and, consequently, fail to show evidence

supporting any undisputed fact.  The motion is denied.

### F.  Other Allegations and Inmates

In various ways, Newberry seeks to expand the scope of this action.[15]  He

suggests his recent transfer to Crossroads Correctional Center—years after he filed

this case—is retaliatory.  He also moves to add claims and/or defendants

concerning his difficulties with the mail room.  *See, e.g.*, Mot. (Doc. 157); Mot.

(Doc. 181).  The deadline for amending the pleadings expired on October 14, 2020.

*See* Scheduling Order (Doc. 13 at 6 ¶ II(A)(1)).  Disputes over what constitutes

legal mail are not good cause for expanding the scope of a complaint concerned

primarily with medical issues.  Further, filing a civil action does not give the Court

authority to monitor a plaintiff's ongoing interactions with the Defendants or other

people who happen to have something to do with the plaintiff's incarceration.  *See,*

*e.g.*, Mot. (Doc. 177), Mot. (Doc. 181).

### V.  Certification

As noted above, *see* Part II, Newberry did not seek and was not granted

---

[15]  Some allegations are so frivolous the Court hesitates to mention them at all. Newberry's occasional accusations of racism, discrimination, and bias lack the most basic supporting facts.  Equally frivolous are his accusations against defense counsels' thoroughly ordinary representation of clients in more than one pending case.  He baselessly asserts that, once he files a lawsuit against a defendant, that defendant cannot perform any job duty that might affect him.  Finally, Newberry is not an attorney admitted to the Bar of this Court and has no authority to seek relief on behalf of other inmates.

leave to proceed in forma pauperis.  Pursuant to Federal Rule of Appellate

Procedure 24(a)(4)(B), however, the Court finds that this litigation uncovered no

significant questions of fact or law.  Newberry failed to develop the factual basis of

his case.  Appeal of this disposition could not be taken in good faith.

Accordingly, IT IS ORDERED:

1.  The Findings and Recommendations of January 7, 2021 (Doc. 92), are

**ADOPTED IN FULL**.

2.  Leave to file the proposed second amended complaint (Doc. 29-2),

excepting the ADA claim and Defendant Scharf, is **DENIED**.

3.  Plaintiff's motion for the appointment of counsel (Docs. 107, 108) is

**DENIED**.

4.  Defendants' motion for summary judgment (Doc. 140) is **GRANTED** as

to all Defendants and all claims.

5.  All other pending motions are **DENIED**.

6.  By separate document, the clerk shall enter Judgment in favor of

Defendants and against Plaintiff.

7.  The Court **CERTIFIES** that any appeal from this disposition would not

be taken in good faith.

DATED this 8th day of September, 2021.

49

Dana L. Christensen, District Judge
United States District Court